IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR–13–71– BLG–DWM-CSO |
| Plaintiff, | |
| | FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE |
| vs. | |
| SCOTT STEVEN REIDY, | |
| Defendant. | |

## I. INTRODUCTION

Defendant Scott Steven Reidy is charged by Indictment with one count each of conspiracy to distribute cocaine, possession of cocaine with intent to distribute, and possession of a firearm in furtherance of a drug trafficking crime, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 18 U.S.C. § 924(c)(1)(A). On January 1, 2012, Reidy was stopped on Interstate 90 in Stillwater County, Montana. After a drug detecting canine alerted to the presence of drugs within the vehicle Reidy was

driving, it was impounded. A subsequent search pursuant to a search warrant revealed cocaine and a firearm.

Pending before the Court is Reidy's motion to suppress evidence seized from the vehicle he was driving. U.S. District Judge Donald W. Molloy referred the motion to the undersigned in accordance with 28 U.S.C. § 636(b)(1)(B) and L.C.R. 59.1. *ECF 20.*[1] Reidy's motion raises two issues: (1) whether the initial traffic stop was supported by reasonable suspicion of criminal activity and if so, (2) whether the traffic stop was unlawfully prolonged without reasonable suspicion to do so.

A hearing was held on October 7, 2013. The Court heard testimony from four witnesses: Billings Police Department Detectives Jamie Schillinger and Michael Robinson, Stillwater County Deputy Sheriff Randy Smith, and Defendant Scott Reidy. *ECF 24.* Because Deputy Smith's stop and questioning were within the bounds of the Fourth Amendment, the motion to suppress should be denied.

## II.   FACTUAL BACKGROUND

---

[1]Citations to *ECF* refer to document and page numbers assigned by the Court's electronic filing system.

The Court finds the following facts based on: (1) the hearing testimony, (2) the video and audio recording of the traffic stop recorded by Deputy Smith admitted as Government's Exhibit A, (3) Defendant's Exhibits 1-3, and (4) the reports of Deputy Randy Smith (*ECF 15-1*) and Detectives Michael Robinson and Jamie Schillinger (*ECF 15-2*).

On December 29, 2011, Drug Task Force agents attached a GPS tracking device to Julie Rozell's 2002 Chevrolet Tahoe as it was parked in her driveway in Billings, Montana. Rozell, who was on state probation, was believed by the Task Force, based on their investigation, to be a methamphetamine dealer who operated a stash house for her source of supply. In the early morning hours of December 30, 2011, the agents learned her Tahoe was headed westbound on I-90. It arrived in Seattle by the end of the day. On January 1, 2012, the Tahoe was again on I-90 headed east. Schillinger testified that a short stay after such a long drive is indicative of a drug run. Once the Tahoe appeared to be headed back to Montana, the agents set up a six-member surveillance team consisting of four FBI Task Force Officers and two Detectives from the Eastern Montana High Intensity Drug Trafficking

Area "HIDTA".

Two agents stayed in Billings and monitored Rozell's house to determine if she was home or traveling in the Tahoe. Agents had been informed by a confidential source that Rozell's boyfriend, Defendant Scott Reidy, owned a black Hummer and was also distributing methamphetamine. The two agents noted the black Hummer was parked outside Rozell's house and had been there off and on since the Tahoe left for Seattle on December 30, 2011.

Meanwhile, Detectives Schillinger and Tom Benjamin contacted Deputy Randy Smith of the Stillwater County Sheriff's Office. The agents wanted a uniformed officer who was a canine handler trained in drug interdiction to conduct a "wall stop." Deputy Smith and his canine "Jordy" qualified. After completing his training in canine handling and drug interdiction, Deputy Smith had been patrolling I-90 conducting drug investigations with Jordy since 2006.

A "wall stop" is a traffic stop on a vehicle by a uniformed officer conducted so that the driver is not aware that he is a suspect in a larger drug investigation. Even though agents have evidence that leads them to believe a driver may be trafficking drugs, a stop is not

made by the uniformed officer unless a traffic violation is observed. Then, depending on the what the officer learns from his initial contact with the stopped vehicle, the officer may ask for consent to search and deploy the canine if consent is withheld. Schillinger and Benjamin met with Smith in Columbus, Montana, to brief him on the investigation and provide him with a radio to communicate with the surveillance team. Smith was given a description of the Tahoe and told that it was returning to Billings after a brief stop in Seattle and that they did not know who or what was inside. Smith was told that other agents would locate the Tahoe and try to find cause for a traffic stop and that he should wait inside the Stillwater County line. Once the Tahoe passed, he should follow it and conduct the "wall stop" if he had a valid reason to do so. The agents testified that if they did not have a lawful reason to make a traffic stop, they would have followed the vehicle back to Billings without stopping it.

Schillinger and Benjamin tracked the Tahoe's progress via the tracking device and saw the vehicle traveling eastbound on I-90 east of Big Timber, Montana. Det. Robinson worked as the scout, traveling in a separate vehicle to make visual contact with the Tahoe. He did so

near Big Timber at approximately 8:00 p.m.  Robinson then passed the Tahoe in an attempt to determine who was inside, but was unable to do so because it was dark and the windows were tinted.  Robinson testified that as he passed the Tahoe, he could not see any lights illuminating the rear license plate as required by Montana law.  *See MCA § 61-9-204(3).*  Robinson communicated this information to Schillinger, who in turn relayed it to Deputy Smith, who was parked in the median along I-90 just inside the Stillwater County line.

Smith had positioned his vehicle facing West,  from where the Tahoe was coming, but at an angle so that he could see it as it approached, and also quickly pursue it.  Smith testified that he was looking at the license plate because he had been told it was not working correctly and that when the Tahoe passed, he also could not see any lights illuminating the license plate.  He then pulled onto the interstate, drove up behind the Tahoe and confirmed with Schillinger that it was the correct vehicle.  He followed the Tahoe for a few miles and still could not see any lights illuminating the license plate.  Smith updated the agents and initiated a traffic stop at 20:21:29 (8:21 p.m.) at

milepost 396. The video does not clearly show whether the Tahoe's license plate was properly illuminated because of the headlights on Smith's patrol car. Smith called in the temporary Montana license plate to dispatch, and approached the Tahoe.

The video of the traffic stop shows Smith approaching the Tahoe within seconds of pulling him over. Smith immediately notifies Reidy that he was stopped because the license plate light was not illuminating the license plate. Smith then asks for Reidy's license, registration, and proof of insurance. The driver produced the documents and the report indicates Smith identified Defendant Reidy by his Montana driver's license.

On the video, Smith asks Reidy whether there was anything illegal in the vehicle, like guns, knives, or drugs. Reidy says no. Smith noted there was some alcohol in the vehicle and Reidy responded that it was from the weekend. Smith then noted it was New Years Day and again asked if there was anything illegal in the vehicle. When asked by Smith whether the Tahoe was his vehicle, Reidy responded that it was his girlfriend, Julie Rozell's vehicle, and that she had let him borrow it for the weekend to go to Bozeman because it got better gas mileage

than his Hummer. Smith then noted to Reidy that he seemed a little nervous, and asked him whether he was hungover from a lot of drinking the night before. Reidy responded "Yeah, a little bit." In response to questions, Reidy indicated he was drinking at bars in Bozeman. Smith told Reidy to wait in the car and returned to his patrol car at 20:23:48. At this point, Reidy has been detained for about two minutes and 20 seconds.

Smith testified there was a very strong odor of men's cologne and air fresheners emanating from the Tahoe and that there were several air fresheners inside. His report references a clear bottle of pills on the dash and an alcohol container box and a duffel bag in the back seat. Smith testified that although all the people he stops are somewhat nervous, Reidy was unusually nervous. Specifically, Smith testified that Reidy did not want to look at him while speaking and that Smith had to pry for information because Reidy did not want to converse with him. Smith notes in his report that while returning to his patrol car, he noted the Tahoe had tinted windows and that there was a cover over the rear storage area of the Tahoe. Smith's training and experience told him that Reidy's behavior, combined with the strong odor and

numerous air fresheners in the car, is indicative of a person carrying drugs.

Back in his patrol vehicle, Deputy Smith informed the surveillance team that Reidy is the only person in the vehicle and that he falsely claimed to have spent the weekend in Bozeman. Smith is told by Schillinger to "do his normal thing and ask for consent and run [his] dog and do all that kind of good stuff." Smith then contacts dispatch to run a driver's license check on Reidy and asks the agents whether Reidy is still on probation. The agents respond that Reidy is not on probation. At 20:26:25, Smith learns from dispatch that Reidy has a valid driver's license and three prior DUI convictions.

At 20:27:30, after Reidy has been detained for six minutes, Deputy Smith returns to speak with Reidy on the driver's side of the Tahoe, explaining that Reidy appears nervous to him, and that even though Reidy has said there is no drugs in the vehicle, everyone says there are no drugs in their vehicle. Smith also says that he has a drug detecting canine with him and asks Reidy for consent to search the vehicle. Reidy declines consent and Smith states that he is going to run the canine on the exterior of the car and that if it indicates the presence

of drugs, the Tahoe will be seized. At 20:28:24, approximately 7 minutes into the traffic stop, Smith tells Reidy to exit the Tahoe. Smith then pats him down for weapons. Deputy Bruursema of Stillwater County is now also on the scene. Smith tells Reidy that he is going to run his dog because his experience tells him Reidy is acting suspicious. He also advises Reidy of the canine search procedure. Reidy chooses to wait in Deputy Bruursema's patrol vehicle while Smith conducts the canine search.

At approximately 20:31:40, Smith deploys Jordy to search for the odor of narcotics emanating from the Tahoe. Smith's report says Jordy "showed alert behavior to the odor of narcotics" on the rear driver's side of the vehicle during both passes around the vehicle. Deputy Smith testified that the conditions for a canine search were not ideal because they were parked on the side of a busy interstate and it was very cold outside. The busy interstate meant that he could not take Jordy off the leash and the cold air meant that emanating odors were not as strong as in warmer weather. Smith testified that he placed Jordy downwind from the Tahoe, gave him the search command, and assisted him around the vehicle. Consistent with his standard procedure, Smith

made the first pass quickly to see if Jordy would show any change in body behavior, such as turning his head, tensing his muscles, or heavy breathing. All are part of Jordy's alert behavior to the odor of narcotics. On the second round, Smith directs Jordy to the seams of the vehicle. Smith testified consistent with his report that Jordy alerted to the odor of narcotics emanating from the rear driver's side of the vehicle on the first, second, and third passes around the Tahoe.[2]

In response to questions from both parties, Smith testified about the difference between a canine "alert" and an "indication," stating that Jordy did not indicate to the odor of narcotics, but merely alerted. Smith explained that an alert is when Jordy's behavior changes because of the odor of narcotics. An indication occurs when Jordy has located the specific source. Smith testified that Jordy did not indicate on a particular location of the Tahoe because he would have had to take him off the leash and he did not do so because of the traffic on the interstate.

There was also questioning about whether Jordy was an active or

---

[2]Although the report does not relate a third pass around the Tahoe, the video shows that Smith and Jordy circled the Tahoe three times.

a passive indicating dog.  Smith explained that Jordy was originally trained to be an active indicator dog that scratches when he detects the odor of narcotics.  But since Jordy was damaging a lot of vehicles with his scratches, he was later trained to be a passive indicator–to sit when he detects narcotics.  Smith testified that he still has trouble with Jordy because he still scratches when he detects narcotics, even though he is supposed to sit passively.  The video clearly shows Jordy scratching on the rear driver's side of the Tahoe, especially on the second and third passes.  Most importantly, in response to questions from the Court, Smith testified that he is trained to read Jordy's body behavior and although Jordy did not indicate the precise location of the narcotics, Jordy's tense muscles and changed pattern of breathing told Smith that there were narcotics in the Tahoe.

The canine search was complete by 20:33:15, approximately 12 minutes after the traffic stop began.  At 20:33:50, Smith places a call to Schillinger, informing him that Reidy denied consent but that Smith construed his nervousness and "all of that" to be reasonable suspicion and ran the dog.  Smith says he "did not get an indication, but got a lot

of alert on the drivers' quarter panel and underneath the vehicle."
Smith also notes that the dog was scratching near the gas tank (also on
the rear driver's side) and wanted to go underneath but that he did not
take him off the leash and allow him to do so because of the heavy
traffic.  Smith and Schillinger discuss what to do next, ultimately
deciding to seize the Tahoe and apply for a search warrant.  The call
ends at approximately 20:38:00.  Reidy has now been stopped for
approximately 17 minutes.  Smith contacts dispatch for a tow truck to
tow the Tahoe back to the Sheriff's garage.

At 20:39:25, Smith returns to Reidy his driver's license and
explains that his dog has told him there was or is drugs in the Tahoe,
that he is therefore going to seize it, have it towed to a secure area, and
apply for a search warrant.  Reidy is told he will be taken to Columbus,
Montana, and released there, and that he cannot take anything from
the vehicle.  Reidy gives them a phone number where he can be
contacted and is told to expect a call tomorrow.  The Tahoe will be
returned to him if it does not contain contraband.

Smith then calls and updates Det. Schillinger again.  At

approximately 20:42:40, Deputy Bruursema's patrol vehicle leaves the scene, headed for Columbus with Reidy inside. The video ends at 20:43:29. Reidy was dropped off at a gas station just off I-90 in Columbus. The reports indicate that Rozell picked him up in the Hummer at 10:17 p.m. and they returned to Billings.

According to Smith's report, he waited at the scene until the tow truck arrived. The TFO's report says that TFO Schillinger and Det. Benjamin met Smith at the scene before the tow truck arrived. Agents noted that the left license plate light was not working and the right side was working, but very dull. Testimony at the hearing revealed the same. There was some discrepancy at the hearing concerning whether the Tahoe's lights were left on so that they could even see whether the license plate lights were working properly, and this issue was not fully resolved. But Deputy Smith and Det. Robinson each testified that they could not see any license plate lights on the Tahoe as it drove down the interstate.

The Tahoe was towed to the Stillwater County Sheriff's Office evidence garage and secured with evidence tape pending a search

warrant.

Reidy testified that when he picked up the Tahoe on January 4, 2012, from the impound lot in Columbus, he took photographs showing that both license plate lights were working properly. Two such photographs were admitted as Exhibits 1 and 2. *ECF 24.* Reidy also testified that he took the Tahoe to a mechanic the next morning who confirmed that both license plate lights were functioning properly. Admitted as Exhibit 3 was an invoice from John C. Auto's Classic Auto Repair in Billings showing that "all lamps work fine inc. lic plate lights." *ECF 27.*[3]

## III. ANALYSIS

### A. THE INITIAL TRAFFIC STOP WAS LAWFUL BECAUSE SMITH HAD REASONABLE SUSPICION OF A VEHICLE EQUIPMENT VIOLATION, AND ALSO BECAUSE THERE WAS REASONABLE SUSPICION THAT IT WAS RETURNING FROM SEATTLE WITH DRUGS

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief

---

[3]Although the invoice was dated a year early at January 5, 2011, this was established at the hearing as an error because Rozell did not own the Tahoe in January 2011.

investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417, (1981). Such investigatory stops are justified by "reasonable suspicion" that criminal activity may be afoot. *Arvizu*, 534 U.S. at 273; *see also United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Cortez*, 449 U.S. at 417. Reasonable suspicion is more than a hunch. "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." *United States v. Valdes-Vega,* 685 F.3d 1138, 1143 (9th Cir. 2012) (*quoting United States v. Montero–Camargo*, 208 F.3d 1122, 1129 (9th Cir.2000) (en banc)). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu,* 534 U.S. at 273 (internal quotations omitted).

In determining whether a traffic stop is supported by reasonable suspicion, courts must consider the totality of the circumstances. *Id.*

And because the subjective motivations of law enforcement officers are irrelevant to Fourth Amendment considerations, it is irrelevant that the criminal activity justifying the stop is merely a traffic violation. *Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Willis,* 431 F.3d 709, 714-15 (9th Cir. 2005).

The Government argues the initial traffic stop was justified because the Tahoe was being operated in violation of a Montana statute requiring license lights allowing the plate to be seen within 50 feet. Montana Code Ann. 61-9-204(3) provides:

> Either a taillamp or a separate lamp must illuminate with a white light the rear registration plate and render it clearly legible from a distance of 50 feet to the rear. A taillamp or taillamps, together with a separate lamp for illuminating the rear registration plate, must be lighted whenever the headlamps are lighted.

The video of the traffic stop, as well as the time of day, establish that it was dark when Deputy Smith stopped the Tahoe on I-90. And both Det. Robinson and then Deputy Smith testified that when they observed the Tahoe driving eastward on the interstate, they were unable to see any license plate lights–and certainly could not read the plate within 50 feet. Although Reidy testified the lights were working

when he picked up the Tahoe from impound and admitted three exhibits in support of his claim the lights were working, this does not outweigh the sworn testimony of three law enforcement officers (Schillinger, Robinson, and Smith). Also, Reidy testified that he picked up the Tahoe on January 4, 2011. Defendant's Exhibit 3, the estimate from John C. Auto's Classic Auto Repair is dated January 5, 201[2] at 7 AM. It appears that Reidy had an opportunity to fix the lights before taking the Tahoe to the Classic Auto Repair shop.

Accordingly, the initial traffic stop was supported by reasonable suspicion of criminal activity because the Tahoe was being operated without the license plate illumination required by Montana law. *See Sanchez v. Arpaio,* 2010 WL 3938353, *6 (D.Ariz. 2010)(finding reasonable suspicion for traffic stop of a vehicle operating in violation of nearly identical Arizona statute), *citing Houston v. City of Coquille,* 2007 WL 4287769, * 4 (D.Or. 2007) (same under Oregon law). Detective Robinson testified that he worked for over seven years as a patrol officer and it is not uncommon to stop vehicles for inadequate license plate illumination.

Furthermore, even if the stop were not justified because of improperly illuminated license plate, Deputy Smith and the surveillance team could have stopped the Tahoe based on reasonable suspicion that it was bringing drugs back to Billings from Seattle. Since the subjective motivations of law enforcement officers are irrelevant to the Fourth Amendment analysis, *Whren,* 517 U.S. at 813, it matters not that agents, to protect their investigation, were choosing not to stop the vehicle absent a traffic or equipment violation. Under the collective knowledge doctrine, also known as the fellow officer rule, in determining whether an investigatory stop, search, or arrest is reasonable under the Fourth Amendment, courts must consider the collective knowledge of all the officers involved in the criminal investigation, even if the officer who took the challenged action was not fully briefed on the investigation. *United States v. Ramirez,* 473 F.3d 1026, 1037 (9th Cir. 2006). Stated otherwise, grounds for a search or a seizure may be based on the collective knowledge of all officers involved in the investigation and reasonable inferences drawn therefrom. *United States v. Jensen,* 425 F.3d 698, 705 (9th Cir. 2005).

Here, the agents knew the Tahoe belonged to Rozell, a methamphetamine dealer.[4] They also knew the Tahoe left Billings in the early morning hours of December 30, 2011, arrived in Seattle at the end of the day, and drove straight back to Billings on January 1, 2012. Ordinarily, people do not drive 800 miles across the Northern Rockies in January, stay for one day, and then drive another 800 miles back home the next day. In the eyes of trained officers experienced in drug investigations, the totality of Reidy's behavior provided reasonable suspicion of drug trafficking to justify a brief investigatory stop.

## B.   DEPUTY SMITH DID NOT UNREASONABLY PROLONG THE INITIAL TRAFFIC STOP TO CONDUCT A DRUG INVESTIGATION

It has long been established that "a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope" and that the "scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." *Terry v. Ohio,* 392 U.S. 1, 19 (1968) (internal

_____

[4]On February 5, 2013, Julie Rozell entered a plea of guilty to conspiracy to possess methamphetamine with intent to distribute. *ECF 63.* She is presently in federal custody. *ECF 102, 105.*

quotation omitted). Reidy argues that Deputy Smith unreasonably prolonged the initial traffic stop by conducting a drug investigation when he should have been issuing a ticket for a vehicle equipment violation.

Officers conducting a lawful traffic stop are free to question individuals about subjects unrelated to the traffic stop so long as the questioning does not extend the duration of the stop. *United States v. Turvin,* 517 F.3d 1097, 1100 (9th Cir. 2008) (*citing Muehler v. Mena*, 544 U.S. 93 (2005)). Similarly, law enforcement is free to deploy well-trained narcotics-detecting canines during a lawful traffic stop without reasonable suspicion. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). If there is reasonable suspicion of criminal activity beyond the reason for the traffic stop, it may be extended beyond the normal duration of a traffic stop. *United States v. Mendez,* 476 F.3d 1077, 1080 (9th Cir. 2007); *see also United States v. Chavez-Valenzuela,* 268 F.3d 719, 724 (9th Cir. 2001) (overruled on other grounds by *Muehler v. Mena,* 544 U.S. 93 (2005)).

In determining whether a traffic stop is unreasonably prolonged,

courts consider the totality of the circumstances surrounding the stop to determine whether the officer's conduct was reasonable. *United States v. Turvin,* 517 F.3d 1097, 1101 (9th Cir. 2008). And since the collective knowledge doctrine also applies here, the Court must consider the knowledge of all the officers involved. *Ramirez,* 473 F.3d at 1037.

First, Jordy alerted to the presence of narcotics within twelve minutes of the stop. In *Mendez*, the Ninth Circuit held that an eight minute stop was not beyond the time normally required to issue a citation in a traffic stop and was therefore not an unreasonably prolonged traffic stop requiring reasonable suspicion. 47 F.3d at 1079-80. In *Turvin,* the Ninth Circuit held that a traffic stop lasting 14 minutes was no longer than an ordinary traffic stop and therefore reasonable suspicion was not required to justify questioning beyond the initial purpose of the traffic stop. 517 F.3d at 1101. Accordingly, under *Turvin* there is no need to conduct a reasonable suspicion analysis because this traffic stop was not unreasonably prolonged. Regardless, even if this case is somehow distinguishable from *Turvin,* Deputy

Smith's actions were justified by reasonable suspicion.

Reidy objects to the use the vehicle tracking information to support reasonable suspicion to question him beyond the scope of the initial traffic stop because the tracking device was placed on Rozell's car by officers acting without a warrant. Reidy is correct that the United States Supreme Court ruled in 2012 that the government's use of a GPS tracking device on a suspect's vehicle to monitor the vehicle's movements is a search under the Fourth Amendment. *United States v. Jones*, — U.S. —, 132 S.Ct. 945 (2012). But the events in this case occurred before the *Jones* decision, when the law of the Ninth Circuit was that use of a GPS tracking device on a vehicle was neither a search nor a seizure within the meaning of the Fourth Amendment. *United States v. Pineda-Moreno,* 688 F.3d 1087, 1090 (9th Cir. 2012) (citing *United States v. McIver,* 186 F.3d 1119, 1126-27 (9th Cir. 1999)).

The Supreme Court has held that searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule, and the Ninth Circuit has specifically held that evidence obtained from GPS tracking devices installed prior

to *Jones* is not subject to the exclusionary rule. *Pineda-Moreno,* 688 F.3d at 1091 (citing *Davis v. United States,* — U.S. —, 131 S.Ct. 2419, 2423-24 (2011). The information gleaned from the GPS tracking device on the Tahoe is therefore properly considered in determining whether Deputy Smith had reasonable suspicion to prolong the traffic stop with his drug investigation.

Even if the Court only considers what Deputy Smith was actually told by the TFO agents and ignores the sum of the collective knowledge, the Court must conclude that Smith had reasonable suspicion to convert the traffic stop into a drug investigation and deploy his canine. Most importantly, within two minutes of seizing Reidy, Deputy Smith knew Reidy was lying about where he had been. Smith knew that Reidy was a suspected methamphetamine dealer and that the Tahoe had made a quick trip to Seattle, yet Reidy told him he had been at bars in Bozeman celebrating New Years. And not only did the first two minutes reveal Reidy's deception about his recent activities, but Smith also noted the car smelled strongly of perfume and multiple air fresheners visible in the car, and that Reidy appeared unusually

nervous and would not look at him when he was speaking. Smith was a trained police officer with eight years of experience in patrolling Interstate 90 in Stillwater County, and five years experience patrolling with his canine. This is a particularized and objective basis for continuing an investigation.

Deputy Smith conversed with the surveillance team for approximately five minutes to relay what he had learned during the first two minutes of the traffic stop. *Turvin* instructs that officers conducting traffic stops are "not required to move at top speed" and such conversations do not unnecessarily prolong the stop. 517 F.3d at 1102. After being told by Schillinger to ask for consent and the deploy the canine if consent was refused, Smith returned to Reidy after just six minutes had elapsed. Smith then properly explained why he felt Reidy was behaving suspiciously and for consent to search the vehicle. By 20:28:24, approximately seven minutes after the stop, Reidy has declined consent and exited the vehicle. Smith subsequently runs the dog around the vehicle and by 20:33:15, less than 11 minutes after Reidy was first seized, the canine has alerted to the presence of

narcotics.  Although there was some issues concerning Jordy's alert, the Court is persuaded by Deputy Smith's explanation of his dog's behavior and why that behavior led him to conclude that there were drugs in the vehicle.  Considering the totality of the circumstances, this police work was well within the bounds of the Fourth Amendment.

### C. Suppression of Reidy's Statements to Law Enforcement In February 2012 Is Not Before the Court, nor is the validity of the search warrant

In his brief, Reidy makes two brief assertions that any statements that he gave to law enforcement officers should be suppressed. *ECF 15 at 7, 15.*  His brief does not specify the facts underlying this argument or any authority for suppressing any statements, other than his arguments that agents acted unlawfully during the wall stop on January 1, 2012.

Testimony at the suppression hearing established that Reidy was interviewed by Det. Robinson and another officer in a vehicle outside Rozell's residence in February 2012.  It was further established that Reidy voluntarily gave incriminating statements after being fully advised of and waiving his *Miranda* rights.  Counsel for Reidy did not

dispute this testimony and agreed that the only issues before the Court are whether Reidy was unlawfully stopped and detained on January 1, 2012. Reidy's counsel also agreed at the hearing that the validity of the search warrant is not challenged here. Accordingly, these issues are not before the Court in this motion to suppress.

## III. RECOMMENDATION

For the reasons set forth above, the Court **RECOMMENDS** that Reidy's Motion to Suppress (*ECF 14*) be **DENIED**.

Pursuant to Judge Molloy's Order dated September 18, 2013, any objections to these Findings and Recommendation must be filed within five days or objection is waived.

Dated this 8th day of October, 2013.

/s/    Carolyn S. Ostby
United States Magistrate Judge