

FILED
OCT 24 2016
Clerk, U.S District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Cause No. CR 13-71-BLG-DWM |
| | CV 16-72-BLG-DWM |
| Plaintiff/Respondent, | |
| vs. | ORDER DENYING § 2255 MOTION AND DENYING CERTIFICATE OF APPEALABILITY |
| SCOTT STEVEN REIDY, | |
| Defendant/Movant. | |

This case comes before the Court on Defendant/Movant Steven Scott Reidy's motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255. Reidy is a federal prisoner proceeding pro se.

**I. Preliminary Review**

The motion is subject to preliminary review before the United States is required to respond. The Court must determine whether "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts.

A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolas*") (Schroeder, C.J.,

1

concurring) (referring to Rules Governing § 2254 Cases). But "it is the duty of the court to screen out frivolous applications and eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases, *cited in* Advisory Committee Note (1976), Rule 4, Rules Governing § 2255 Proceedings.

## II. Background

Reidy was indicted after an admittedly pretextual traffic stop led to the discovery of cocaine and a handgun in the vehicle he was driving on Interstate 90 in Stillwater County. The vehicle, a Chevy Tahoe, was registered to someone officers suspected of drug trafficking. Detectives had attached a GPS tracker to the Tahoe. They had seen it at a stash house and knew it had been driven from Billings to Seattle and back again within three days. They wanted to search it, but they did not want to alert the driver that law enforcement had already connected the Tahoe to drug trafficking. So, as the vehicle approached Stillwater County, the detectives contacted Deputy Smith, whom they knew to be a K9 officer. They asked him to follow the Tahoe and make an effort to find a traffic violation so it could be stopped on that basis and potentially a consent search or a canine sniff could follow. One detective, in an unmarked vehicle, passed the Tahoe and relayed to other officers, including the deputy, that he did not think the license plate was sufficiently illuminated to be visible from 50 feet behind the vehicle, as

required by state law.[1] He also said he saw the Tahoe change lanes several times without signaling.

Deputy Smith testified to the following facts at the suppression hearing. He parked his car in the highway median with his headlights off, waiting for the Tahoe to pass by. When it did, he looked at the rear of the vehicle but was not able to see the license plate. Mot. Hr'g Tr. (Doc. 31) at 59:14-25. He turned on his headlights and pulled out of the median to follow the Tahoe. The detectives told him he was following the correct vehicle. He followed the Tahoe for about three miles. Because his headlights shone on it, he was still unable to determine whether the license plate lights were operative. He saw the Tahoe make a lane change, but it was properly signaled. He checked the vehicle's speed, but it was within the limit. Deputy Smith stopped the vehicle because the license plate light was not operable. *Id.* at 60:1-62:17.

After the Tahoe had pulled over, the deputy could read the license plate, because his spotlight was on it. He could have checked to see whether the license plate lights were operable as soon as he got out of his patrol car, but he did not. He immediately approached the passenger compartment of the Tahoe. When he asked Reidy, the driver, for his license and registration, the deputy was hit with a strong odor of air fresheners and men's cologne. In addition, Reidy was evasive in his

---

[1] *See* Mont. Code Ann. § 61-9-204(3) (2011).

3

answers, gave responses the deputy knew to be false, and would not make eye contact, and the back storage area of the Tahoe was covered in a manner Smith had not seen before. Mot. Hr'g Tr. at 63:16-66:4.

Matters developed further from there, but the facts leading up to the stop are the ones Reidy contests in his § 2255 motion.

Reidy moved to suppress the fruits of the traffic stop, but the motion was denied. Reserving his right to appeal its denial, Reidy pled guilty to possessing cocaine with intent to distribute it, a violation of 21 U.S.C. § 841(a)(1) (Count 1), and one count of possessing a firearm in furtherance of drug trafficking, a violation of 18 U.S.C. § 924(c)(1)(A) (Count 2). He was sentenced to serve 27 months on Count 1 and a consecutive five-year term on Count 2 for a total of 87 months in prison. On March 26, 2015, the Ninth Circuit Court of Appeals affirmed this Court's ruling denying the motion to suppress. Mem. (Doc. 58) at 3, *United States v. Reidy*, No. 14-30010 (9th Cir. Mar 26, 2015). Reidy's conviction became final 90 days later, on June 24, 2015. *Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 653-54 (2012). Reidy timely filed his § 2255 motion on June 9, 2016. 28 U.S.C. § 2255(f)(1).

### III. Claims and Analysis

Reidy argues that counsel was ineffective, both in the trial court and on appeal, in connection with the motion to suppress. His claim is governed by the

4

standards of *Strickland v. Washington*, 466 U.S. 668 (1984). To support further proceedings, Reidy must allege facts sufficient to support an inference (1) that counsel's performance fell outside the wide range of reasonable professional assistance, *id.* at 687-88, and (2) that there is a reasonable probability that, but for counsel's unprofessional performance, the result of the proceeding would have been different, *id.* at 694.

In essence, Reidy claims counsel's performance was deficient because he failed to show that the video recording of the traffic stop proved the officers did not have probable cause to believe his rear license plate lights were too dim to meet the requirements of state law.[2]

## A. Probable Cause vs. Reasonable Suspicion

First, probable cause was not required. To claim it was, Reidy relies on a statement in *Whren v. United States*, 517 U.S. 806 (1996): "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810. But to say a stop is reasonable when probable cause supports it does not necessarily mean the same stop is unreasonable when supported only by reasonable suspicion. Reasonable suspicion is sufficient to support a traffic stop. *See, e.g., Navarette v. California,*

---

[2] The prejudice prong of the *Strickland* test is not at issue. Had the evidence been suppressed, the United States presumably would have had no evidence against Reidy. *See* Offer of Proof (Doc. 33) at 3.

5

\_\_ U.S. \_\_, 134 S. Ct. 1683, 1687 (2014); *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000), *overruled on other grounds by Heien v. North Carolina*, \_\_ U.S. \_\_, 135 S. Ct. 530, 534 (2014); *United States v. Stewart*, 551 F.3d 187, 192 (2d Cir. 2009).

Reidy argues there is a difference between "investigatory" stops, which can be based only on reasonable suspicion, and a stop "for a traffic violation" that is not followed up by an investigation of that violation. Br. in Supp. at 30-32. Deputy Smith testified that, when he stopped Reidy's vehicle, he did not check to see whether the license plate was visible 50 feet from the rear of the vehicle but immediately approached the driver and asked for his license and registration. Mot. Hr'g Tr. (Doc. 31) at 63:7-16. Thus, Reidy argues the deputy was required to have probable cause before he made the stop, because his failure to investigate shows he had in effect already decided there was a ticket-worthy violation and no further investigation was necessary.

But no law requires a deputy to pause to inspect the exterior of a vehicle at the side of an interstate highway in the dark before approaching the driver within to establish personal contact and check license and registration. As the Supreme Court has recognized, such a rule would be dangerous and unrealistic. *See, e.g., Arizona v. Johnson*, 555 U.S. 323, 330-33 (2009). The deputy's "ordinary inquiries incident to the traffic stop," *Rodriguez v. United States*, \_\_ U.S. \_\_, 135

S. Ct. 1609, 1614-15 (2015), were permissible regardless of whether the circumstances supporting the stop amounted to probable cause or reasonable suspicion.

As Reidy recognizes, there is a difference between a traffic stop based on reasonable suspicion and a traffic stop based on probable cause. But the difference does not arise before the stop is made. It arises in the consequences that are permitted to follow:

> [T]raffic stops justified by reasonable suspicion are subject to additional limitations that those justified by probable cause are not. A traffic stop based on reasonable suspicion, like all *Terry* stops, must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." It also "cannot continue for an excessive period of time or resemble a traditional arrest." By contrast, a stop based on probable cause affords an officer considerably more leeway. In such seizures, an officer may engage in a warrantless arrest of the driver, a warrantless search incident to arrest of the driver, and a warrantless search incident to arrest of the vehicle if it is reasonable to believe evidence relevant to the crime of arrest might be found there.

*Rodriguez*, 135 U.S. at 1621 (Thomas, J., dissenting) (internal quotation marks and citations omitted).[3]

---

[3] The issue in *Rodriguez* was whether a traffic stop could be prolonged for a canine sniff. Justice Thomas, joined by Justices Alito and Kennedy, parted company with the majority on the theory that probable cause justifies the seizure of a person, and since the driver's seizure was authorized by the Fourth Amendment, no additional justification was required to prolong the stop for the sniff. By contrast, the majority held that even a traffic stop based on probable cause may not be unnecessarily prolonged beyond the point where the reason for the stop has been entirely fulfilled, unless some additional reason for suspicion of criminal activity materializes. *See* 135 S. Ct. at 1612. This rule, too, applies regardless of whether the stop is initially based on reasonable suspicion or probable cause. But even the majority recognized that an officer may

7

Reidy's distinction between an "investigatory stop" and a "violation stop" is not reflected in the law. In fact, it is a variant of the argument rejected in *Whren*, which held that an officer's real purpose in making a stop is irrelevant. *See Whren*, 517 U.S. at 813-16. "[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." *Id.* at 814 (emphasis in original). Thus, whatever Deputy Smith's subjective intent, assuming he was telling the truth about the facts he observed, they only had to add up to reasonable suspicion, not probable cause.

**B. What the Officers Actually Saw**

Reidy also argues that Deputy Smith was not telling the truth about the facts he observed. Reidy claims the video of the traffic stop plainly demonstrated to anyone who saw it that all three officers lied when they claimed to have verified, after Reidy left the scene of the stop, that the rear license plate was not properly illuminated.[4] On one hand, he points out, the audiotape of the stop recorded Deputy Smith telling him to shut off his vehicle, and the videotape shows that the

---

speak to the driver and obtain license and registration information as an "ordinary incident" of any stop, that is, an activity "reasonably related in scope to the circumstances which justified the interference in the first place."

[4] Reidy says "the video, albeit somewhat fuzzy, does show, upon careful examination, that the license plate was illuminated with its own lighting while Deputy Smith was following the Tahoe." Br. in Supp. at 13. If it is possible to see that only by carefully examining a fuzzy video, then the video does not compellingly demonstrate that the officer, while driving at 75 miles per hour in the dark on a very cold winter night, definitely could see the license plate light was operable and adequately illuminating the plate from a distance of 50 feet. But, at any rate, Reidy says counsel pointed out this fact on appeal. *Id.* Whatever else it is not evidence of, it is also not evidence of deficient performance by counsel.

8

Tahoe's lights shut off when Reidy turned the vehicle off and got out. Br. in Supp. at 18. On the other hand, he says, both Deputy Smith and a detective said they inspected the license plate lights after Reidy was transported away from the scene and noted that the left light did not work at all and the right light was obscured by grime and was very faint. *Id.* at 16-18. From these two premises, Reidy infers, "there was no possibility that either [Smith] or Detective Schillinger examined the license plate lights to see if they were working after Detective Schillinger arrived." *Id.* at 18.

The videotape stopped less than a minute after Reidy left the scene. Findings and Recommendation (Doc. 27) at 14. At the hearing, no one clarified whether all of the Tahoe's lights remained off until it had been towed away. *Id.* But the record suggests several possibilities other than perjury by the officers. Smith said the keys were still in the Tahoe when Reidy got out. *See id.* at 18 (quoting Mot. Hr'g Tr. at 83:7-84:3). The lights could have been turned back on to check the plate lights. Or, even if the headlights and motor were off, possibly some lights, such as dashboard and radio lights and the plate lights, remained engaged. *See, e.g.*, Mot. Hr'g Tr. at 87:10-15. Regardless, the point is that even Reidy's own description of the tape does not prove what he claims it proves. Similarly, Reidy testified at the hearing, but neither his testimony nor pictures he took after he retrieved the vehicle from the impound lot proved that the lights were

9

operating as required when Smith pulled him over. For these very reasons, courts make credibility determinations as to whose testimony to believe.

More fundamentally to the *Strickland* analysis, Reidy's observations are intended to impeach the officers' credibility. They would have more weight if counsel had not questioned the officers' credibility at all, but he did, persistently. *See, e.g.*, Mot. Hr'g Tr. at 84:11-24 (eliciting testimony that Smith, contrary to his normal practice, did not give Reidy a ticket or even a warning about the license plate light); Objection (Doc. 34) at 2-3; Appellant Br. at 16-18, *Reidy*, No. 14-30010 (9th Cir. filed June 3, 2014). Because the tape could not do what Reidy claims it does, and because counsel did ensure that Judge Ostby and the appellate court viewed it, he does not show that counsel's performance was unreasonable.

### C. Facts Supporting Reasonable Suspicion

Finally, Reidy contends that Judge Ostby clearly erred in stating that Detective Robinson, who passed Reidy before Smith stopped him, and Smith himself "certainly could not read the plate within 50 feet." Findings and Recommendation (Doc. 27) at 17. Reidy reaches this point by first arguing that Detective Schillinger's testimony should be disregarded because he did not observe anything until after the traffic stop, then by unreasonably construing some words used by Detective Robinson and Detective Smith in their testimony. *See* Br. in Supp. at 16-29.

Schillinger testified that the right bulb was so faint that he "didn't even notice it until I was standing there[,] right there at the bumper," much closer than 50 feet away. Mot. Hr'g Tr. at 27:11-28:8. If accepted, his testimony tended to corroborate Smith's testimony that he stopped the vehicle because the license plate was not properly illuminated. The timing of the observation is not a reason to disregard it.

As to Robinson, Reidy says he "never testified that he could not read the license *plate* . . . only that he could not see the license plate *lights*" from 50 feet. Br. in Supp. at 22 (emphases added). And, as to Smith, Reidy says he "testified that he was unable to read the rear of the license plate when it passed him at the median" but "never said that he was within 50 feet of the vehicle when that occurred." Further, when Smith was following the Tahoe, Reidy says, Smith "said only that when he was within 50 feet of the Tahoe he could not see the license plate light," whereas state law required that he be able to see the plate, not the light. *Id.* at 27.

Whatever counsel might have argued, any reasonable factfinder probably would construe both officers' testimony to speak not to the lights themselves but to their capacity to illuminate the plate so that it was legible from 50 feet away. It was nighttime. Without the lights, the plate would not be visible at all, much less legible.

11

Moreover, Reidy does not accurately portray all of Smith's testimony. Smith said that when he was parked in the median, "I was unable to *see* the rear license *plate* of the vehicle when it passed me." He added, "In my approximately three miles of following behind the vehicle, I could not see the license plate or *make out the numbers* of the license plate." Mot. Hr'g Tr. at 61:3-16 (emphases added).

When an officer parked in the median cannot even see that there is a rear license plate, he has reason to wonder whether the plate would be legible from 50 feet away. When he has also followed that vehicle for three miles trying, unsuccessfully, to determine whether the license plate lights sufficiently illuminate the numbers, he has further reason to suspect the plate is not legible from 50 feet away. Smith articulated specific facts supporting rational inferences that Reidy's license plate was not legible as required by state law. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968). The law does not require him to prove he was correct.

### D. Conclusion

Reidy's allegations do not support an inference that counsel's performance "fell outside the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 687-88. Judge Ostby obviously viewed the tape carefully herself. *See* Findings and Recommendation (Doc. 27) at 3, 6-8, 9-10, 12-14. Contrary to Reidy's claim that counsel "failed to bring . . . out on appeal" the importance of the

tape, *see* Br. in Supp. at 9, counsel encouraged the appellate court to view the tape because, he said, it contradicted the officers' testimony, just as Reidy now says. And the appellate court did review the tape. *See, e.g.*, Oral Argument at 4:23-5:10, *Reidy*, No. 14-30010 (9th Cir. Mar. 6, 2015), *available at* www.youtube.com (accessed Oct. 13, 2016). Reidy's attempts to reargue the motion are not persuasive in themselves. Therefore, his claims do not meet the performance prong of the *Strickland* test.

## IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Because the suppression motion was so important to the case, the Court has closely reviewed Reidy's allegations. But they do not meet even the relatively low threshold required for a COA. Any competent lawyer could have argued the

motion just as counsel here did. Even if merely rearguing the motion could establish that counsel's performance was deficient, Reidy's interpretations of the evidence are not persuasive in themselves. There is no reason to encourage further proceedings.

Accordingly, IT IS HEREBY ORDERED as follows:

1. Reidy's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Docs. 60, 61) is DENIED;

2. A certificate of appealability is DENIED. The Clerk of Court shall immediately process the appeal if Reidy files a Notice of Appeal;

3. The Clerk of Court shall ensure that all pending motions in this case and in CV 16-72-BLG-DWM are terminated and shall close the civil file by entering judgment in favor of the United States and against Reidy.

DATED this 24th day of October, 2016.

Donald W. Molloy
United States District Court